UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| ITNAMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Docket No. 2:15-cv-96-NT |
| | ) |
| NUTMEG SENIOR RIDES, INC. f/k/a | ) |
| ITNNORTHCENTRALCONNECTICUT, | ) |
| | ) |
| Defendant. | ) |
| | ) |
| | ) |

**ORDER ON DEFENDANT'S MOTION TO DISMISS**

Before the Court is the Defendant's motion to dismiss (ECF No. 11) the Plaintiff's Complaint pursuant to Federal Rule of Civil Procedure 12(b)(1). For the reasons stated below, the motion is **DENIED**.

BACKGROUND

This matter arises out of a contract dispute between ITNAmerica (the "**Plaintiff**") and ITNNorthCentralConnecticut, which now operates under the name Nutmeg Senior Rides, Inc. (the "**Defendant**"). Compl. ¶¶ 1, 35, 38, 52 (ECF No. 1). According to the allegations in the Complaint, the Plaintiff is a Maine nonprofit corporation that provides transportation services for seniors by working with local affiliates in different areas across the country. Compl. ¶ 2. The Defendant is a nonprofit corporation that offers "rides for seniors and adults with visual[] impairments in ten towns in North Central Connecticut." Compl. ¶¶ 3, 10, 38.

In September of 2007, the parties entered into an Affiliate Community Agreement (the "**Agreement**") with a five year term. Compl. ¶¶ 9, 16.[1] The Agreement gave the Defendant access to the Plaintiff's "proprietary software and programs," including the Plaintiff's ITNRides software that "serve[d] both as a research database and as an operational support system." Compl. ¶¶ 12, 13. The Agreement required the Defendant to use this proprietary software "solely in connection with the provision of ITNA Programs and Services." Compl. ¶ 14.

The Defendant agreed to pay the Plaintiff annual affiliate fees, which included an annual base fee and an adjusted fee based on the number of members and rides provided. Compl. ¶ 15. The Agreement also contained a non-compete provision preventing the Defendant from operating a community-based transportation service for seniors in North Central Connecticut for a period of one year following the termination or expiration of the Agreement. Compl. ¶ 20.

In March of 2012, the relationship between the parties began to deteriorate when they began discussions on the terms of a new agreement. Compl. ¶ 27. At this time, the Defendant began to express reservations concerning the Plaintiff's "strategic vision and overall financial well-being." Compl. ¶ 28. On September 25, 2012, the Plaintiff notified the Defendant that its affiliate fees would increase

---

[1] The term of the Agreement was initially 5 years "but renewed automatically for successive one year terms" until either party gave the other written notice of non-renewal. Compl. ¶ 16. To avoid automatic renewal, notice of non-renewal needed to be sent by certified mail least 180 days before the expiration date. Compl. ¶¶ 16-17. If the Defendant wanted to terminate the agreement to pursue affiliation with another organization while continuing operations, the Agreement required 12 months prior written notice. Compl. ¶¶ 18, 19. If the Defendant simply ceased operations, the Agreement required 90 days' notice prior to termination. Compl. ¶ 19.

beginning October 1, 2013. Compl. ¶ 29. The parties continued discussions over the course of the next year. Compl. ¶ 30.

On September 20, 2013, the Defendant notified the Plaintiff that it was "suspend[ing] payment of affiliate fees to [the Plaintiff] until further notice" and that it intended "to continue providing rides to individuals in the community." Compl. ¶ 31. Thereafter, the Defendant ceased paying affiliate fees to the Plaintiff. Compl. ¶¶ 32, 34. From the fall of 2013 to December of 2014, the parties unsuccessfully attempted to resolve their dispute. Compl. ¶¶ 32-33. On December 12, 2014, the Defendant sent a letter to the Plaintiff stating that the Plaintiff had elected not to renew the "original affiliation agreement" with the Defendant a "few years ago" and that the Defendant planned to "move forward independently" and continue operating in North Central Connecticut. Compl. ¶ 35. The Plaintiff states that it never elected not to renew the Agreement. Compl. ¶ 36. Rather, the Plaintiff claims that the Agreement was in fact still binding on the parties in December of 2014—and remains so today—because neither party effectively terminated the Agreement. Compl. ¶¶ 36-37.

## PROCEDURAL HISTORY

On March 11, 2015, the Plaintiff filed a Complaint against the Defendant in this Court. In lieu of filing an answer, the Defendant moved pursuant to Federal Rule of Civil Procedure 12(b)(1) to dismiss all of the counts against it, alleging that this Court lacks subject matter jurisdiction because the Plaintiff's action does not satisfy the amount in controversy requirement under 28 U.S.C. § 1332. Def.'s Mot. to Dismiss

1. The Plaintiff filed a response in opposition, Pl.'s Opp'n to Def.'s Mot. to Dismiss 8 ("**Pl.'s Opp'n**") (ECF No. 12), and an affidavit from Plaintiff's President Katherine Freund. June 3, 2015 Aff. of Katherine Freund ¶ 1 (ECF No. 12-1). In its reply, the Defendant argues that the Plaintiff has still failed to meet its burden of establishing the requisite amount in controversy. Def.'s Reply 1 (ECF No. 13).

## LEGAL STANDARD

"Federal courts are courts of limited jurisdiction," restricted to hear matters "authorized by Constitution and statute." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). Federal Rule of Civil Procedure 12(b)(1) permits a party to move to dismiss a complaint on the grounds that the court lacks subject matter jurisdiction. It is the plaintiff's burden to establish that federal jurisdiction is proper. *Abdel-Aleem v. OPK Biotech LLC*, 665 F.3d 38, 41 (1st Cir. 2012).

## DISCUSSION

Under 28 U.S.C. § 1332, federal "district courts . . . have original jurisdiction [over] all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs," and diversity of citizenship exists. 28 U.S.C. § 1332(a). The well-established rule for determining whether the amount in controversy requirement has been met is that:

> [U]nless the law gives a different rule, the sum claimed by the plaintiff controls if the claim is apparently made in good faith. It must appear to a legal certainty that the claim is really for less than the jurisdictional amount to justify dismissal.

4

*St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 288-89 (1938) (footnotes omitted). Thus, under this rule, "a plaintiff's general allegation that the dispute exceeds the jurisdictional minimum is sufficient to support jurisdiction." *Dep't of Recreation & Sports v. World Boxing Ass'n*, 942 F.2d 84, 88 (1st Cir. 1991).

If, however, this allegation of damages is challenged, "the party seeking to invoke jurisdiction has the burden of alleging with sufficient particularity facts indicating that it is not a legal certainty that the claim involves less than the jurisdictional amount." *Stewart v. Tupperware Corp.*, 356 F.3d 335, 338 (1st Cir. 2004) (citation and internal quotation marks omitted). Commentators have interpreted the legal certainty concept as demanding the "conclusion that as a matter of law, the jurisdictional amount cannot be recovered or, stated differently, no reasonable jury could award that amount." 14AA Charles Alan Wright, Arthur R. Miller, Edward H. Cooper, Federal Practice & Procedure § 3702 (4th ed.). This burden can be met "by amending the pleadings or by submitting affidavits." *Dep't of Recreation & Sports*, 942 F.2d at 88.

Although there is no dispute that the parties are diverse, the Defendant contends that the Complaint does not meet § 1332's $75,000 amount in controversy requirement because "[t]he total amount of damages appearing on the face of the Complaint . . . is $23,881.71." Def.'s Mot. to Dismiss. 4. Thus, the Plaintiff must "allege with sufficient particularity facts that in some way support the contention that there is more than $75,000 at stake." *Abdel-Aleem*, 665 F.3d 38 at 42 (citation

5

and internal quotation marks omitted). For the reasons discussed below, the Plaintiff has met its burden and the Defendant's jurisdictional challenge fails.

## I. Calculating the Amount in Controversy in Cases Seeking Injunctive Relief

In addition to a claim for breach of contract damages amounting to $23,881.71, Compl. ¶¶ 48-49, the Plaintiff seeks, *inter alia*, injunctive relief based on the Defendant's alleged breach of the non-compete provision in the Agreement preventing the Defendant from operating a community-based transportation system for seniors in North Central Connecticut. Compl. ¶¶ 50-56. The Plaintiff contends that the value of enjoining the Defendant, coupled with $23,881.71 in contract damages, satisfies the amount in controversy requirement. Pl.'s Opp'n 6. Because the Plaintiff may aggregate two or more of its claims against the Defendant, *see Snyder v. Harris*, 394 U.S. 332, 335 (1969), the Plaintiff need only establish that its claim for injunctive relief is worth at least $51,118.30.

"In actions seeking declaratory or injunctive relief, it is well established that the amount in controversy is measured by the value of the object of the litigation." *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 347 (1977). In other words, "the value of the matter in controversy is measured not by the monetary judgment which the plaintiff may recover but by the judgment's pecuniary consequences to those involved in the litigation." *Richard C. Young & Co. v. Leventhal*, 389 F.3d 1, 3 (1st Cir. 2004); *see also* 14AA Charles A. Wright, Arthur R. Miller, Edward H. Cooper, Federal Practice & Procedure § 3708, 143-44 (4th ed.) (noting that the amount in controversy is based on the "value to the plaintiff to enjoy the property[,] business, or

6

personal affairs that constitute the subject of the action free from the activity sought to be enjoined"). Normally, this value determination is assessed from the viewpoint of the plaintiff.[2] *CE Design Ltd. v. Am. Econ. Ins. Co.*, 755 F.3d 39, 43 (1st Cir. 2014); *see also Bedard v. Mortgage Elec. Registration Sys., Inc.*, No. 11-CV-117-JL, 2011 WL 1792738, at *2 (D.N.H. May 11, 2011) (quoting *Dep't of Recreation & Sports of P.R. v. World*, 942 F.2d 84, 89 (1st Cir. 1991)) ("One (if not necessarily the only) way to take that measure is to assess 'the value of the right [the plaintiff] seeks to vindicate.' ").

## II.   Calculating the Amount in Controversy in the Case at Hand

Here, the Freund affidavit states that the Defendant's "operation of a community-based transportation service in the North Central Connecticut area makes it virtually impossible for [the Plaintiff] to attract" a new affiliate for that area. June 3, 2015 Aff. of Katherine Freund ¶ 5. The Plaintiff alleges that, if a new affiliate could be found in the area, a standard Affiliate Agreement "would require payment of" $82,500[3] over "the five years of the agreement's term" in addition to a yearly fee of $1.00 for each member of the new affiliate and $.01 per ride. June 3, 2015 Aff. of Katherine Freund ¶ 6. Thus, according to the Plaintiff, "[t]his amount, when added

---

[2]   The Plaintiff correctly points out that the First Circuit has noted that, in some cases "the right sought to be gained by a plaintiff is not always quantifiable" and that "[i]t is logical and more feasible in these cases that the amount in controversy be assessed from the defendant's perspective . . . ." *CE Design Ltd.*, 755 F.3d at 48. However, "[w]hile the value of injunctive relief is difficult to quantify, federal courts have not had difficulty 'find[ing] the requisite jurisdictional amount in actions brought to enforce covenants not to compete.' " *Info. Strategies, Inc. v. Dumosch*, 13 F. Supp. 3d 135, 142 (D.D.C. 2014) (quoting *Premier Indus. Corp. v. Tex. Indus. Fastener Co.*, 450 F.2d 444, 446 (5th Cir. 1971)). Here, because the value of the claim can be readily determined from the Plaintiff's perspective, I do not need to address the value of the litigation from the Defendant's viewpoint.

[3]   According to the Plaintiff, a new affiliate would be required to pay the following fees: $30,000 in year one, $15,000 in year two, $15,000 in year three, $15,000 in year four, and $7,500 in year five. June 3, 2015 Aff. of Katherine Freund ¶ 6.

7

to the affiliate fees owed by [the Defendant] . . . easily exceeds the jurisdictional minimum." Pl.'s Opp'n 8.

The Plaintiff points to *Novus Franchising, Inc. v. Livengood*, No. CIV. 11-1651 MJD/TNL, 2012 WL 38580, at *5 (D. Minn. Jan. 9, 2012), a case involving an amount-in-controversy challenge to a claim to enforce a non-compete agreement. Noting that "[i]t is difficult to attract a new franchisee when a former franchisee is improperly competing within the same area," the court accepted the plaintiff's evidence showing that the value of a new franchise in the area would exceed the amount in controversy requirement over time. *Id.* The court reasoned that, "[a]t this point in the litigation, the Court cannot say that it is a legal certainty that [plaintiff] cannot prove that the injunction is worth" enough to satisfy § 1332's amount in controversy requirement. *Id.* at *6. Other courts have reached similar conclusions. *See, e.g., JTH Tax, Inc. v. Frashier*, 624 F.3d 635, 640 (4th Cir. 2010) ("For our purposes, all that matters is that we cannot say *with legal certainty* that [Plaintiff's] injunction [to enforce a non-compete] is worth less than the requisite amount.").

The Defendant contends that the Plaintiff "has not provided the Court with any support for the proposition that it would even be able to secure a new affiliate if [the Defendant] were compelled to cease operation." Def.'s Reply 5. The Defendant notes that the Plaintiff has approached other affiliates in the area but that "none have been willing to take over [the Defendant's] operations in the event [the Defendant] were to cease providing rides." Def.'s Reply 5; *see also* June 22, 2015 Decl. of Margaret Smith Hale ¶ 7 ("I am aware that [the Plaintiff] has approached other . . .

. affiliates in Connecticut to identify a possible successor to [the Defendant] . . . but those affiliates have declined to take over operations in the North Central Connecticut area because of the cost of operation and their limited resources."). According to the Defendant, the lack of evidence of new affiliates in the area makes this case "easily distinguishable from *Novus Franchising*" because the *Novus* plaintiff provided evidence of "potential franchisees." Def.'s Reply 5.

The Defendant's argument regarding the insufficiency of Plaintiff's evidence is misplaced. At this stage, the Plaintiff need only "set forth facts which, if true, would prevent [the] court from concluding to a legal certainty that [Plaintiff] could not recover more than $75,000." *King v. York Golf & Tennis Club*, 230 F. Supp. 2d 123, 125 (D. Me. 2002). Although the Defendant attempts to challenge the veracity of the Freund affidavit by claiming that no one is willing to affiliate with the Plaintiff in North Central Connecticut, "this is not the time to resolve the merits of the dispute, only to determine whether it is apparent to a legal certainty that [the Plaintiff] cannot recover the amount claimed." *Allstate Ins. Co. v. Chretien*, No. 12-cv-38-DBH, 2012 WL 6645697, at *2 (D. Me. Dec. 20, 2012). Because the Plaintiff has claimed that the Defendant's alleged on-going breach of the non-compete provision has made it impossible to find a new affiliate, and because it is plausible that finding a new affiliate could potentially be worth $82,500 to the Plaintiff, it is not legally certain that the Plaintiff's claim is worth less than $75,000. *See Zacharia v. Harbor Island Spa, Inc.*, 684 F.2d 199, 202 (2d Cir. 1982) ("The jurisdictional determination is to be made on the basis of the plaintiff's allegations, not on a decision on the merits.

Moreover, even where those allegations leave grave doubt about the likelihood of a recovery of the requisite amount, dismissal is not warranted.").

The Defendant unpersuasively argues that even if the Plaintiff had provided competent evidence that it would suffer lost affiliate fees, the "the value of enforcing a one-year noncompete provision certainly should not be measured by fees paid by a new affiliate over five years." Def.'s Reply 6 n. 2. But "the value of the matter in controversy is measured . . . by the judgment's pecuniary consequences to those involved in the litigation." *Richard C. Young & Co.*, 389 F.3d at 3. Although the non-compete is limited to a one-year period the value of an injunction from the Plaintiff's perspective need not be limited to one year when it stands to gain financially past the expiration of the non-compete. The Plaintiff's potential agreement with a new affiliate in North Central Connecticut would not automatically terminate once the non-competition provision expired, rather the Plaintiff would continue to benefit financially for the remaining balance of the agreement.[4] *See Novus Franchising,* 2012 WL 38580, at **2, 6 (calculating the value of enforcing a two-year non-compete agreement over the course of a 10-year term required by franchise agreement); *Grow*

---

[4] Even if I were to accept this argument, it still would not necessarily mean that the value of the injunction is less than $75,000. Under the Plaintiff's new standard Agreement, the base fee for year one is $30,000 and the Plaintiff is also entitled to $1.00 per member and $.01 for every ride. *See* June 3, 2015 Aff. of Katherine Freund ¶ 6 ("In addition to the base fees, the affiliate would be required to pay, on an annual basis $1.00 for each member and $.01 for each ride."). Thus, even if I were to limit my inquiry to the $30,000 due for year one—as opposed to including the remaining base fees spread out over the next four years—it is still not legally certain that the Plaintiff would not satisfy the amount in controversy requirement based on the $23,881.71 in contract damages and the additional fees generated by new members and rides provided. The Plaintiff also argues that I should consider its claims for unjust enrichment, misappropriation of trade secrets, interest, and attorney's fees, in determining the amount in controversy. I do not address these arguments because I am satisfied that the value of enforcing the non-compete agreement is sufficient to meet the requisite jurisdictional amount.

*Biz Int'l, Inc. v. MNO, Inc.*, No. CIV. NO. 01-1805-DWF, 2002 WL 113849, at *2 (D. Minn. Jan. 25, 2002) (calculating the value of enforcing a non-compete over the course of a ten-year franchise agreement for purposes of determining the amount in controversy).

"[A]ll the plaintiff must do to carry [its] burden in the face of a motion to dismiss is to set forth facts, which, if true, would prevent the trier from concluding *to a legal certainty* that the potential recovery is capped at a figure below" $75,000. *Barrett v. Lombardi*, 239 F.3d 23, 30-31 (1st Cir. 2001). The Plaintiff has met this burden. Based on the facts alleged by the Plaintiff, taken as true, I cannot say that it is legally certain that Plaintiff's claim is worth less than the jurisdictional amount.

## CONCLUSION

For the reasons stated above, the Court **DENIES** the Defendant's motion to dismiss (ECF No. 11).

SO ORDERED

/s/ Nancy Torresen
United States Chief District Judge

Dated this 8th day of September, 2015.